**SO ORDERED.**

**SIGNED this 8th day of December, 2014.**



BENJAMIN A. KAHN
UNITED STATES BANKRUPTCY JUDGE

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF NORTH CAROLINA
DURHAM DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| Sue-Anna Shults Smith, | ) | Case No. 13-81362 |
| Debtor. | ) | |
| Sue-Anna Shults Smith, | ) | |
| Plaintiff, | ) | |
| v. | ) | Adversary No. 14-09039 |
| SunTrust Bank, | ) | |
| Defendant, and | ) | |
| Kenneth Dale Smith, | ) | |
| Intervenor-Defendant. | ) | |

MEMORANDUM OPINION DISMISSING ADVERSARY PROCEEDING

THIS ADVERSARY PROCEEDING came before the Court for hearing on August 28, 2014, on the Motion to Dismiss by Defendant SunTrust Bank ("SunTrust") [Doc. #17] (the "Motion to Dismiss"), SunTrust's Memorandum in Support of Motion to Dismiss [Doc. # 18]

("SunTrust's Brief"), and Debtor's Response to Defendant's Motion to Dismiss [Doc. # 24] ("Plaintiff's Response"). At the hearing, Brian D. Darer and Michael J. Crook appeared on behalf of SunTrust, Jeremy Todd Browner appeared on behalf of Intervenor-Defendant Kenneth Dale Smith ("Mr. Smith"), and Benjamin D. Busch appeared on behalf of Plaintiff Sue-Anna Shults Smith ("Plaintiff" or "Debtor"). After the hearing, the Court took the matter under advisement and allowed the parties through and including September 4, 2014, to submit any supplemental information or authorities with respect to: (1) whether, based upon the allegations and attachments to the Complaint and the matters of which this Court may take judicial notice, the Plaintiff should be deemed as a matter of law to have ratified the transactions of which she complains in the Complaint; and (2) whether this Court may consider the issue of ratification under the circumstances of this case in connection with SunTrust's Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding by Bankruptcy Rule 7012. On August 29, 2014, Plaintiff filed Debtor's Post-Hearing Brief: Ratification [Doc. # 26] ("Debtor's Supplemental Brief"), and, on September 3, 2014, counsel for SunTrust filed its Memorandum of Authority [Doc. # 28] ("SunTrust's Supplemental Brief").

Having considered the submissions of the parties, the undisputedly authentic documents either referred to in the Complaint or of which this Court may take judicial notice, and the arguments of counsel, the Court finds that the Motion to Dismiss should be granted and the Complaint should be dismissed for the reasons set forth herein.

## I. Background[1]

The Debtor and Mr. Smith's marriage began in May of 1978, but ended in separation and divorce in 2007 and 2008 amid the Debtor's allegations of infidelity, abuse, and forgery by her now ex-husband. (Complaint for Divorce from Bed & Board, Post-Separation Support, Alimony, Attorneys' Fees, And Equitable Distribution Of Marital Property ("Divorce Complaint"), ¶ 14; First State Court Order, as defined below, Findings of Fact ¶ 2). During the marriage, the parties owned two properties as tenants by the entireties: a home located at 8419 Doughton Dr., Bahama, North Carolina ("the Home"), and a farm consisting of 36.50 acres located at 9611 Rougemont Rd., Bahama, North Carolina ("the Farm"). (See First State Court Order, Decretal ¶¶ 2 and 3; Complaint ¶ 6). Also during the marriage, in September of 2002, Mr. Smith obtained a loan in the form of the Second Home Equity Line, as defined below, from Central Carolina Bank, a division of National Bank of Commerce, by forging the Debtor's signature to the loan documents, including the supporting Equity Line Deed of Trust. (Complaint ¶¶ 10, 12, 13, 15). An employee of National Bank of Commerce notarized the

[1] In considering a motion to dismiss, a court may take judicial notice of its own records in the same or a related case, documents attached to the Complaint, and documents attached to the motion to dismiss that are integral to the Complaint and undisputed as to their authenticity. See Philips v. Pitt Cnty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009); Cason v. Holder, 815 F.Supp.2d 918, 922 n.8 (D.Md. 2011) (citing Thurman v. Robinson, No. 94-6998, 1995 WL 133350, at *2 (4th Cir. Mar. 28, 1995); and United States Fidelity & Guar. Co. v. Lawrenson, 334 F.2d 464, 467 (4th Cir. 1964)). Pursuant to these standards, the Court has considered the State Court Orders, as that term is defined herein, which Orders previously were admitted into evidence in the Bankruptcy Case No. 13-81362 (the "Bankruptcy Case") with respect to the Debtor's objection to the claim of Mr. Smith (the "Smith Claim Objection") [Bankr. Case Doc. # 48], and the Joint Scheduling Memorandum filed in this Adversary Proceeding on October 31, 2014 [Doc. # 40]. The Court further has considered documents to which the Plaintiff directly refers in the Complaint, including: (a) Complaint for Divorce from Bed & Board, Post-Separation Support, Alimony, Attorneys' Fees, And Equitable Distribution Of Marital Property ("Divorce Complaint") (See Complaint, ¶ 14(a) (referring to Divorce Complaint, and purporting to attach the Divorce Complaint as Exhibit B to the Complaint, although the Complaint as filed does not attach any exhibits); SunTrust's Brief (attaching the Divorce Complaint as Exhibit A)); (b) Answer And Counterclaim ("Divorce Answer") (Id.); (c) SunTrust's Proof of Claim and the exhibits thereto, filed as Claim No. 3-1 in the Bankruptcy Case (the "Second Home Equity Line Claim") (See Complaint, ¶ 8 (purporting to attach the Second Home Equity Line Claim as Exhibit B to the Complaint)); (d) the March 21, 2011 Modification of Equity Line Agreement between Debtor and SunTrust (the "Modification Agreement") (See Complaint, ¶¶ 33-34; Second Home Equity Line Claim Exhibit); and (e) the claims filed in the Bankruptcy Case as set forth herein.

forgery. Id. ¶ 15. According to the Debtor, Mr. Smith used the loan proceeds "to finance an extra-marital affair," and the Debtor received no benefit from the loan proceeds at the time of the loan. Id. ¶¶ 18-20.

On May 21, 2007, the Debtor filed her Divorce Complaint in the North Carolina General Court of Justice, District Court Division, Durham County ("the State Court") against Mr. Smith, seeking post-separation support, alimony, equitable distribution of marital property, and divorce from bed and board (the "Divorce Litigation"). In the Divorce Complaint, the Debtor described how Mr. Smith had forged her signature on the Second Home Equity Line loan documents. (Divorce Complaint ¶ 10.a.; Complaint ¶ 14.(a).). In the Divorce Answer, Mr. Smith admitted to the forgery. (Complaint ¶ 14.(a).; Divorce Answer ¶ 10).

In connection with resolving the Divorce Litigation, and with Mr. Smith's answer on record, the State Court entered various orders, including the following: (1) August 18, 2008 Order Resulting from Memorandum of Judgment/Order (effective nunc pro tunc to July 16, 2008) ("the First State Court Order"); (2) November 14, 2011 Order Re: Motion to Modify Alimony for Contempt and Attorneys' Fees (the "Second State Court Order"); (3) February 8, 2012 Consent Order Re: Motion for New Trial Motion to Modify Alimony and Motion for Contempt and Attorneys' Fees ("the Third State Court Order"); and (4) September 13, 2013 Order for Contempt ("the Fourth State Court Order")[2] (the First State Court Order, the Second State Court Order, the Third State Court Order, and the Fourth State Court Order shall be collectively referred to herein as "the State Court Orders").

[2] The Debtor argues that, prior to filing bankruptcy, she filed a motion in the State Court for relief from the Fourth State Court Order pursuant to Rule 59 of the North Carolina Rules of Civil Procedure (which means that the motion was filed within 10 days of the entry of the Fourth State Court Order on September 13, 2013) (Debtor's Supplemental Brief, at p. 3, n. 1), and, at the hearing on this matter, the Debtor indicated that she intends to pursue that motion. Nevertheless, as of the hearing on this matter, the Debtor apparently has not attempted to schedule that motion for hearing in the State Court despite over a year passing since entry of the order.

The First State Court Order arose out of a mediation between the parties and was entered by consent. It provides in relevant part:

> 3. [Debtor] shall have sole possession and ownership of the farm . . . as well as the house . . . .
>
> 4. [Debtor] will bring the mortgage on the house . . . and the equity line on the farm . . . current. She will thereafter be responsible for the [First Home Mortgage] monthly payment, as well as the payment to Suntrust on the first equity line (a/c# xxx … 3748)[3] and will indemnify Defendant on the same, provided that his alimony is and has been paid in a timely manner . . . .
>
> 5. [Mr. Smith] will, effective immediately and for a twelve (12) month period hereafter, be responsible for the monthly payment [on the Second Home Equity Line] on the house, as well as for the monthly payment [on the Farm Equity Line]; and will indemnify and hold her harmless for the same.
>
> 7. [Mr. Smith] and/or his counsel will work with [the Debtor] and/or her counsel to attempt to terminate the current listing contract on the house. . ., and [the Debtor] shall immediately choose and contract with a new realtor to sell the house.
>
> * * *
>
> 9. [Mr. Smith's] obligation on the two (2) mortgages shall end after twelve (12) months, . . . however if the house is sold, his obligation to pay the [Second Home Equity Line] shall end, as that and both other encumbrances will be paid from the proceeds of the sale. Any proceeds above the cost of these three (3) encumbrances shall belong to [Debtor], free of any claims of [Mr. Smith].
>
> 10. [Debtor] may, if she chooses, sell portion(s) of the farm, with any and all proceeds being her separate property, and [Mr. Smith's] obligation to pay on that loan . . . shall continue unaffected. If, however, [Debtor] sells the entire farm, the proceeds shall be used to pay off this mortgage, after which [Debtor] receives any and all remaining proceeds.

(First State Court Order, Decretal ¶¶ 3, 4, 5, 9, and 10). At the time of entry of the First State Court Order, the Second Home Equity Line was scheduled to mature on September

[3] This account number does not match any of the account numbers reflected on the claims filed in the Bankruptcy Case.

26, 2012. From September 10, 2008, through March 23, 2012, the Debtor made payments on the Second Home Equity Line. (Complaint ¶ 46).

As reflected in the Second Home Equity Line Claim, SunTrust has been the holder of the Second Home Equity Line at all times relevant to this case.[4] Following entry of the First State Court Order, in October of 2009, the Debtor informed SunTrust that her husband had forged her signature on the Second Home Equity Line loan documents, and requested that SunTrust investigate the loan. Id. ¶ 22. In response, SunTrust notified the Debtor that it had opened a fraud investigation with respect to the loan. Id. ¶ 24. In January of 2010, however, SunTrust notified the Debtor that it was "unable to pursue . . . [the Debtor's] case as fraudulent[,]" because the Debtor failed to provide SunTrust with a copy of a police report of the fraud. Id. ¶ 28.

Nearly a year later, in December of 2010, SunTrust offered the Debtor a modification of the Second Home Equity Line. (Complaint ¶ 30). In response, the Debtor again noted that her signature was a forgery, and stated that she only had been paying the monthly minimum to prevent foreclosure. Id. ¶ 31. The Debtor stated that, due to the forgery, she did not want to be liable on the loan. Id.

Despite these statements and her knowledge of the forgery, however, the Debtor signed a modification agreement on March 21, 2011 (the "Modification Agreement"), and continued making payments under the loan, in amounts as modified under the Modification Agreement. Id. ¶¶ 33. Under the Modification Agreement, the Debtor is listed as the sole borrower. (See generally Modification Agreement).[5] In the Modification Agreement, the Debtor acknowledged that the Second Home Equity Line was secured by a lien on the home, and that "there are no

[4] SunTrust merged with National Bank of Commerce in or around 2004, and now is the holder of the Second Home Equity Line as a result of that merger. (Complaint ¶ 11).

[5] The Modification Agreement lowered the interest rate under the loan for the period of March 25, 2011, through February 25, 2012, from a variable rate of The Wall Street Journal Prime Rate plus 0.5% to a fixed rate of 1%. See id. ¶ 3. The Modification did not change the maturity date of September 26, 2012. See generally id.

defenses, adjustments, or offsets to [the Debtor's] obligation to pay under the terms of the Equity Line Agreement." Id. ¶ 1.[6]

On September 13, 2013, the State Court entered the Fourth State Court Order, which arose as a result of the Debtor's failure to list the Home for sale and her failure to make the required payments thereon. (Fourth State Court Order, Findings of Fact ¶¶ 5-7). In the Fourth State Court Order, the State Court found, inter alia: (1) that the Debtor could not assert the fact that Mr. Smith had "signed [Debtor's] name to secure said loan" as a defense to her obligations to make the ongoing payments under the loan, as the Debtor "knew of the same prior to her agreeing to sign the [First State Court Order] entered August 18, 2008 and all subsequent Consent Orders entered thereafter[,]" id. ¶ 9; (2) that the First State Court Order required the Debtor to continually list the Home for sale, despite the Debtor's testimony before the State Court that she did not understand that provision of the First State Court Order, id. ¶ 7; and (3) that the First State Court Order required the Debtor to make all payments on the Second Home Equity Line, despite her testimony that she did not understand that requirement, id. ¶ 8. Moreover, the State Court explained that "[t]he property is currently titled solely to the [Debtor] and [Mr. Smith] has no responsibility for expenses associated with said property pursuant to the Orders entered in this case." Id. ¶ 10. In conclusion, the Court found that the Debtor was in willful civil contempt of the First State Court Order for her failure to make the loan payments and her failure to list the Home for sale. Id. ¶¶ 1 and 4. As a consequence, the State Court ordered the Debtor to bring the Second Home Equity Line current, to refinance the loan to remove the Mr. Smith's name from the loan on or before October 29, 2013, and to relist the Home for sale. Id., Decretal ¶¶ 2, 3, and 4. The order further provided that the Debtor was

[6] On July 19, 2012, SunTrust determined that the Debtor was in default under the Second Home Equity Line, and commenced the foreclosure process on the Home. (Complaint ¶ 39).

sentenced to thirty (30) days in the Durham County Jail, which sentence was suspended for so long as the Debtor remained in compliance with these terms. Id. ¶ 6.

On October 28, 2013, the day prior to the State Court's deadline for the Debtor to refinance the loans secured by the Home, the Debtor filed a voluntary petition under Chapter 13 of the United States Bankruptcy Code, 11 U.S.C. 101 et seq. (the "Code"). The filing of the petition stayed the civil contempt proceedings.[7] On December 16, 2013, Mr. Smith filed Claim No. 5-1 in the Bankruptcy Case (the "Smith Claim"), which Claim was disallowed by Order of this Court entered June 3, 2014 [Bankr. Case Doc. # 109] (the "Smith Claim Order"). In addition to the Smith Claim, only four other proofs of claim were filed in the case, asserting claims as follows: (1) JPMorgan Chase Bank, N.A., Loan No. *****3776, in the amount of $146,999.56, secured by a first lien on the Home ("the First Home Mortgage"); (2) SunTrust Bank, Loan No. *****0461, in the amount of $95,923.99, secured by a second-priority lien on the Home ("the First Home Equity Line"); (3) SunTrust Bank, Loan No. *****4464, in the amount of $79,370, secured by a third-priority lien on the Home ("the Second Home Equity Line"); and (4) SunTrust Bank, Loan No. *****2187, in the amount of $343,081.63, secured by a first-priority lien on the Farm ("the Farm Equity Line"). The deadline to file proofs of claim in the Bankruptcy Case for non-governmental entities was February 23, 2014, and for governmental entities was April 28, 2014. No other proofs of claim were filed prior to these deadlines.

The Debtor commenced this adversary proceeding by filing her Complaint on May 28, 2014. In the Complaint, the Debtor purports to assert four claims for relief against SunTrust as follows: (1) declaratory relief, seeking declarations that: (a) the Modification Agreement is void

[7] Post filing, the Debtor entered into an agreement to sell the Home, and, on February 24, 2014, this Court approved the sale of the Home for $325,000 [Bankr. Case Doc. #66] ("the Residence Sale Order"). The proceeds of the sale of the Home satisfied the First Home Mortgage and the First Home Equity Line in full. Pursuant to the Residence Sale Order, the remaining proceeds (the "Disputed Proceeds") were placed in trust with the Standing Trustee, pending further order of the Court.

for lack of consideration; (b) SunTrust has no lien on the Disputed Proceeds; (c) any and all claims against the Debtor's bankruptcy estate involving the Second Home Equity Line are disallowed; and (d) the Debtor be entitled to claim her $30,000 homestead exemption in the Disputed Proceeds (the "First Claim for Relief"); (2) unjust enrichment, seeking recovery of all payments made by the Debtor on the Second Home Equity Line between September 10, 2008, through March 23, 2012 (the "Second Claim for Relief"); (3) unfair and deceptive trade practices under Chapter 75 of the North Carolina General Statutes for obtaining the Modification Agreement in violation of N.C. Gen. Stat. § 75-55(1) (the "Third Claim for Relief"); and (4) unfair and deceptive trade practices due to SunTrust's failure to perform an adequate inquiry into the fraudulent origination and forgery of the Second Home Equity Line, requiring a police report prior to initiating an internal fraud investigation, attempting to collect the loan against the Debtor despite knowing of the Debtor's allegations of forgery, reporting the default to credit reporting agencies, and offering the Modification Agreement for the sole purpose of exculpating itself and its employees from any wrongdoing (the "Fourth Claim for Relief").

On July 16, 2014, Mr. Smith filed his Motion to Intervene in this adversary proceeding [Doc. # 14]. On September 12, 2014, the Court, without objection from the Debtor, granted the Motion Intervene as a party defendant in this adversary proceeding [Doc. # 30]. On October 8, 2014, Mr. Smith filed a Motion to Dismiss the Complaint against SunTrust [Doc. # 33] ("Mr. Smith's Motion to Dismiss").

The Debtor, SunTrust, and Mr. Smith (the "Parties") have filed their Joint Scheduling Memorandum in this case [Doc. # 40]. In the Joint Scheduling Memorandum, the Parties expressly consented to this Court entering final orders with respect to all matters raised in the pleadings. (Joint Scheduling Memorandum ¶ D.(1)).

## II. Jurisdiction and Authority

This Court has jurisdiction over the subject matter of this proceeding under 28 U.S.C. § 1334. The matter has been referred to this Court under 28 U.S.C. § 157(a) and Local Rule 83.11 of the United States District Court for the Middle District of North Carolina. In the Complaint, the Debtor asserts that her claims are "core" matters as contemplated by 11 U.S.C. § 157(b)(2)(H). (Complaint ¶ 4). Under the circumstances and allegations in this case, each of the Debtor's four claims for relief is wholly dependent upon the efficacy of the Debtor's obligations under the Second Home Equity Line, as modified by the Modification Agreement, and is therefore necessarily resolved in the claims allowance process. The First Claim for Relief specifically seeks, among other relief, a declaration as to the validity of the Second Home Equity Line Claim. Therefore, this Claim for Relief is a core matter under 28 U.S.C. § 157(b)(2)(B). Because the facts and circumstances of this case are such that the Debtor's claims for relief necessarily fail to the extent that the Debtor is determined to be liable under the Second Home Equity Line Claim, the remaining claims for relief are claims "related to" the bankruptcy case, but which claims necessarily will be resolved in the claims allowance process. To the extent that any claims for relief are "related to" the bankruptcy case, but not necessarily resolved in the claims allowance process, the Parties have consented to this Court entering a final order with respect to such claims pursuant to 28 U.S.C. § 157(c)(2).

## III. Standards for Consideration of a Motion to Dismiss Pursuant to Rule 12(b)(6)

This Court recently summarized the standards for consideration of a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding by Rule 7012 of the Federal Rules of Bankruptcy Procedure as follows:

> Rule (12)(b)(6) of the Federal Rules of Civil Procedure requires dismissal of all or part of a complaint if it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Plaintiffs may proceed into the litigation process only when their complaints are "justified by both law and fact." Francis v. Giacomelli, 588 F.3d 186, 192-93 (4th Cir. 2009).
>
> The standards set forth in Bell Atlantic Corporation v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), and Ashcroft. V. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), with regard to a motion to dismiss pursuant to Rule 12(b)(6) guide the Court in determining whether or not to dismiss the counts of the Debtor's Complaint. Thus, each count of the Complaint will survive the Motion to Dismiss only if the Complaint contains "sufficient factual matter, accepted as true, 'to state a claim for relief that is plausible on its face.'" Iqbal, 556 U.S. at 678, 129 S.Ct. 1937 (quoting Twombly, 550 U.S. at 570, 127 S.Ct. 1955). The United States Supreme Court set forth this plausibility standard as follows:
>
>> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.' "
>
> Id. (citations omitted).
>
> To determine plausibility, all facts set forth in the Complaint are taken as true. However, "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement" will not constitute well-pled facts necessary to withstand a motion to dismiss. Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009).
>
> In analyzing the counts of the Complaint in light of the Motion to Dismiss, the Court will determine if the Debtor has "nudged [her] claims across the line from conceivable to plausible." Twombly, 550 U.S. at 570, 127 S.Ct. 1955. The Court will also consider documents incorporated into the Complaint by reference, and matters of which a court may take judicial notice. Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007).

Rutledge v. Wells Fargo Bank, N.A. (In re Rutledge), 510 B.R. 491, 498-99 (Bankr. M.D.N.C. 2014).

"Although '[a]ll allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party,' a 'court need not [] accept as true allegations that contradict matters properly subject to judicial notice or by exhibit.'" Anderson v. Kimberly-Clark Corp., 570 Fed.Appx. 927, 931 (Fed. Cir. 2014) (quoting Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001)). See also GFF Corp. v. Associated Wholesale Grocers, Inc., 130 F.3d 1381, 1385 (10th Cir. 1997) ("[F]actual allegations that contradict…a properly considered document are not well-pleaded facts that the court must accept as true.").

Finally, when a motion to dismiss is based upon an affirmative defense, the court may dismiss the claim only if all the facts necessary to the affirmative defense clearly appear on the face of the complaint, or if the complaint on its face reveals an "insurmountable bar" to recovery. See, e.g., Devlin v. Wells Fargo Bank, N.A., No. 1:12-CV-000388-MR-DLH, 2014 W.L. 1155415, at *3-4 (W.D.N.C. Mar. 21, 2014) (dismissing claim on statute of limitations grounds where the facts on the face of the complaint, along with consideration of the underlying loan application which the court considered for purposes of a motion under Rule 12(b)(6), demonstrated that the claim was barred by the statute of limitations).

## IV. Discussion

Each of the Plaintiff's claims is predicated upon the Second Home Equity Line being unenforceable against the Debtor and her property due to the forgery of her signature by Mr. Smith. Specifically, the First Claim for Relief requests that the Court declare the Modification Agreement void, because it "ostensibly obligates Debtor to a loan that she did not sign, receive the consideration for, or ratify." (Complaint ¶ 41

(emphasis added)). The First Claim for Relief further requests that the Court determine that SunTrust has no lien on the funds because of the forgery. Id. ¶ 44. The Second Claim requests that the Court enter judgment against SunTrust requiring that it disgorge the payments the Debtor made under the Second Home Equity Line as unjust enrichment, because she was not liable on the debt due to the forgery. Id. ¶ 47-49 (asserting, inter alia, that her payments were not a ratification of the loan). The Third Claim for Relief purports to assert a claim under N.C. Gen. Stat. § 75-55, as a result of the bank wrongfully obtaining an affirmation of the Second Home Equity Line in the Modification Agreement, when the bank purportedly knew that the Debtor had a complete defense to the underlying debt. Id. ¶ 55. Finally, the Fourth Claim for Relief attempts to assert a claim pursuant to "Chapter 75 of the North Carolina General Statutes," alleging that "SunTrust's acts and omissions during its targeted debt-collection activities on a known forged document directed at the Debtor constitutes an unfair and deceptive trade practice." Id. ¶ 67.

Because each claim is entirely dependent upon the unenforceability of the Second Home Equity Line against the Debtor at the time of the putative actions of SunTrust, if the Second Home Equity Line was in fact an enforceable obligation of the Debtor at the time that SunTrust attempted to collect, the Plaintiff's claims necessarily fail. For the reasons set forth herein, the Court determines that the Plaintiff knowingly ratified the obligations under the Second Home Equity Line and is estopped from denying the enforceability of that obligation. Therefore, the Court will dismiss each of the Plaintiff's Claims for Relief.

As an additional basis for dismissal of the First, Third, and Fourth Claims for Relief, the Court determines that the Debtor has not stated a claim for economic duress with respect to her execution of the Modification Agreement. For these reasons, the Complaint will be dismissed.

**Ratification and Estoppel**

SunTrust argues that the Plaintiff should be estopped from disavowing her obligations under the State Court Orders, including an assumption of the obligation to pay the Second Home Equity Line, and necessitating dismissal of the case under Rule 12(b)(6). (SunTrust Brief, at pp. 9 ("Plaintiff should be estopped from asserting that she is not obligated to pay the [Second Home Equity Line] . . . . In her prior proceedings in Durham County District Court, she represented in the Consent Order that she was responsible for the payments and agreed to make those payments.")). Perhaps anticipating that, despite the forgery, her prior actions would be used to bind her to the obligations of the Second Home Equity Line, the Plaintiff summarily alleges in the Complaint that she did not ratify the underlying loan documents. (Complaint ¶¶ 41 and 47). Nevertheless, the facts as alleged in the Complaint and those documents of which this Court may take judicial notice as set forth above establish as a matter of law that the Plaintiff is estopped from denying her ratification of the Second Home Equity Line, thereby necessitating dismissal of the Complaint under Rule 12(b)(6).

As stated by the North Carolina Court of Appeals, ratification is:

> "the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him." Restatement (Second) of Agency § 82 (1958). "Ratification requires intent to ratify plus full knowledge of all the material facts." Contracting Corp. v. Bank of New Jersey, 69 N.J. 352, 361, 354 A.2d 291, 296 (1976).

> It "may be express or implied, and intent may be inferred from failure to repudiate an unauthorized act…or from conduct on the part of the principal which is inconsistent with any other position than intent to adopt the act." Id.

American Travel Corp. v. Central Carolina Bank, 57 N.C.App. 437, 442, 291 S.E.2d 892, 895, disc. review denied, 306 N.C. 555, 294 S.E.2d 369 (1982).

Ratification also can occur "where a party accepts benefits and performs under an agreement." Goodwin v. Webb, 152 N.C.App. 650, 656, 568 S.E.2d 311, 315 (2002) (Greene, J. dissenting) (citation omitted) (citing Lowry v. Lowry, 99 N.C.App. 246, 254, 393 S.E.2d 141, 146 (1990), rev'd per curiam, 357 N.C. 40, 577 S.E.2d 621 (2003) (adopting dissenting opinion)). See also Nisselson v. Softbank Am Corp. (In re Marketxt), 361 B.R. 369, 402 (2007) (finding that a party can ratify an agreement by "'intentionally accepting benefits under the contract for a period of time after he has the opportunity to avoid it' or by 'acting upon it, performing under it, or affirmatively acknowledging it'" (quoting VKK Corp. v. National Football League, 244 F.3d 114, 123 (2d Cir. 2001))).

As indicated by the last phrase in North Carolina's definition of ratification, "to constitute ratification as a matter of law, the conduct must be consistent with an intent to affirm the unauthorized act and inconsistent with any other purpose." American Travel Corp., 57 N.C.App. at 442, 291 S.E.2d at 896. Nevertheless, "[w]hether a party has ratified a contract may be determined as a matter of law if the evidence is not controverted or is incontrovertible." Yumilicious Franchise, LLC v. Barrie, No. 3:13-CV-4841-L, 2014 WL 4055475, at *9 (N.D. Tex. Aug. 14, 2014).

The Debtor concedes that she was fully aware of the forgery of her signature on the Second Home Equity Line loan documents no later than the filing of the Divorce

Complaint in May of 2007. (Complaint ¶ 14; Divorce Complaint ¶ 10.a.).[8] After that time, the Court finds that she engaged in numerous actions which are inconsistent with any purpose other than intentionally and knowingly adopting the obligation under the Second Home Equity Line and the lien securing that liability.

Over a year after filing the Divorce Complaint in which she alleged the forgery, the Debtor and Mr. Smith consented to the terms and entry of the First State Court Order. The First State Court Order "resolved all outstanding issues" in the Divorce Litigation. (First State Court Order, at p. 1, ¶ 1). Under the First State Court Order, the Debtor agreed—and the State Court ordered that—Mr. Smith's obligation to make payments on the Second Home Equity Line would cease at the earlier of the expiration of 12 months, or the sale of the Home. Id. at pp. 2-3, ¶¶ 5 and 9. The Debtor further acknowledged in the First State Court Order that the Second Home Equity Line constituted an encumbrance on the Home that would be satisfied from the proceeds of any sale. Id. at p. 3, ¶ 9.[9] The First State Court Order, to which the Debtor agreed to be bound, required

---

[8] The Debtor argues that she did not have full knowledge of the facts because she did not receive Truth in Lending Disclosures, did not know that the loan could negatively amortize, and was not given disclosures that by signing the order she "would be exculpating SunTrust from any wrongdoing." (Debtor's Supplemental Brief at pp. 3-4). Under the circumstances and claims involved in this case, these facts were not "material" for purposes of ratification. Nowhere in the Complaint does the Debtor challenge the terms of the loan or make any argument that the loan terms exculpated SunTrust from any other claims. Instead, the Debtor challenges the efficacy of the loan and the lien solely due to the forgery of her signature. It is undisputed that she had full knowledge of the forgery, the loan obligation, and the lien on the Home securing the obligation. (First State Court Order at p. 3, ¶¶ 5 and 9).

[9] Attempting to evade her obligation under the orders with respect to the Second Home Equity Line, the Debtor argues that the First State Court Order cannot be read to require her to pay that loan. The Debtor acknowledges that the order provided as follows: (a) Mr. Smith was required to make the payments on the loan only for 12 months or until the Home was sold; (b) after 12 months, Mr. Smith's payment obligations on that loan would end; and (c) if the home was sold, the "encumbrance" from the Second Home Equity Line would be paid from the proceeds of the sale. (Debtor's Supplemental Brief, pp. 2-3). Nevertheless, the Debtor argues that "these sentences say nothing about Debtor's liability to SunTrust. It was only five years later that the Durham County Family Court interpreted these sentences to mean that Debtor was 'to pay the SunTrust loan #4464 despite plaintiff testifying that she did not understand same.'" Id. at p. 3 (quoting Fourth State Court Order ¶ 8). The Debtor's suggested reading of the First State Court Order is unreasonable. The order clearly states that the Second Home Equity Line is an "encumbrance" that will be paid from the proceeds of any sale. From this language, the Debtor cannot plausibly argue that she did not

Mr. Smith to sign a deed transferring the Home solely into the Debtor's name. Id. at p. 3, ¶ 11.

In March of 2011, the Debtor entered the Modification Agreement, a document in which she "acknowledges there are no defenses, adjustments, or offsets to [her] obligation to pay under the terms of the [Second Home Equity Line]." (Modification Agreement at p. 1, ¶ 1).[10] After Mr. Smith's obligations to make the payments under the Second Home Equity Line ended, and at times both before and after the Debtor executed the Modification Agreement, the Debtor continued to make payments on the Second Home Equity Line. (Complaint ¶ 46).

After entry of the First State Court Order, the Debtor continued to engage in the Divorce Litigation. She filed three motions between June and October of 2011 seeking to modify alimony, to hold the debtor in contempt of the First State Court Order, and to modify the First State Court Order. (Second State Court Order, at p. 1). As a result of these motions, she obtained two orders of contempt against Mr. Smith on November 14,

---

understand that the order ratified and acknowledged the lien. It is also illogical to interpret the order and agreement in a way that, after 12 months, neither party would have an obligation to pay the loan secured by the "encumbrance." How could Mr. Smith's obligation to make payments end after 12 months unless the Debtor was required to make the payments thereafter? If his obligation to make the payments continued until there was a sale, then there would be no need set an outside limit to his obligation at 12 months. See, e.g., Marcuson v. Clifton, 154 N.C.App. 202, 204, 571 S.E.2d 599, 601 (2002) (explaining that a court must interpret a contract as a whole, giving meaning to all its provisions); Samba Enterprises, LLC v. iMesh, Inc., No. 06 Civ, 7660(DC), 2009 WL 705537, at *5 (S.D.N.Y. Mar. 19, 2009) ("A court should not interpret a contract in a manner that would be 'absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties.'" (quoting Lipper Holdings, LLC v. Trident Holdings, LLC, 1 A.D.3d 170, 171, 766 N.Y.S.2d 561, 561 (1st Dep't 2003))). Therefore, the First State Court Order clearly provides that the Debtor will be responsible for the payments under the Second Home Equity Line after twelve months.

[10] The Debtor attempts to avoid this acknowledgement of her obligations under the Second Home Equity Line by arguing that the Modification Agreement was obtained "by a substantially unequal bargaining position under threat of foreclosure of the Debtor's principal residence." This appears to be an attempt by the Debtor to assert that the Modification Agreement is unenforceable due to the doctrine of economic duress. Although the Debtor has not specifically attempted to state a claim for economic duress, the facts of this case do not support such a defense to the efficacy of the Modification Agreement, as discussed infra.

2011 (the Second State Court Order) and February 8, 2012 (the Third State Court Order), respectively. In the Second State Court Order, which was entered on the motion by the Debtor for contempt due to Mr. Smith's default in his alimony payments,[11] the State Court again observed that the Debtor was responsible for the Second Home Equity Line. (Second State Court Order, at p. 2, ¶ 15).[12]

Despite the requirements of the First State Court Order (First Sale Order at p. 3, ¶7), the Debtor failed to list the Home for sale and failed to make payments on the Second Home Equity Line. As a result, Mr. Smith filed a motion for contempt in the State Court in July of 2013. The State Court granted Mr. Smith's Motion and entered the Fourth State Court Order, specifically finding that "[t]he fact that [Mr. Smith] signed [the Debtor's] name to secure [the Second Home Equity Line] cannot be used as a defense to [Mr. Smith's] Motion for Contempt. [The Debtor] knew of the same prior to her agreeing to sign [the First State Court Order] and all subsequent Consent Orders entered thereafter." (Fourth State Court Order at p. 2, ¶ 9). The State Court did not specify whether it reached this conclusion due to estoppel, quasi-estoppel, judicial estoppel, ratification, or some other doctrine. Regardless upon which of these doctrines the State Court relied and whether this finding is binding on this Court,[13] this Court agrees with the

---

[11] The Debtor's effort to hold Mr. Smith in contempt of the First State Court Order was not the only manifestation of her acceptance of the benefits of the order. The Debtor also accepted title to the Home solely in her name as afforded to her by the Order, and in her Complaint at ¶ 44 and at the hearing on this matter, she demands that she is entitled to the entirety of the proceeds of the sale in the event that the lien of SunTrust is declared invalid.

[12] The Second State Court Order subsequently was superseded and vacated by consent by the Third State Court Order.

[13] SunTrust argues that the Debtor is collaterally estopped from relitigating this issue due to the conclusion of the State Court in the Fourth State Court Order. (SunTrust's Brief at pp. 6-9). The Debtor argues that collateral estoppel does not apply because the Fourth State Court Order is not final and because SunTrust was not a party to the order. (Plaintiff's Response at pp. 2-7). (See also Notice of Additional Authority [Doc. # 29]). For the reasons set forth herein, it is unnecessary for the Court to determine whether collateral estoppel applies in this case, because

necessary implication of the State Court in its findings that the Debtor is bound by her prior actions and agreements. The Plaintiff, having knowingly agreed to be responsible for the obligations of the Second Home Equity Line in exchange for receiving the benefits under the mediated separation agreement, cannot now be heard to disavow a portion of the agreement. Whether this result stemmed from ratification, estoppel, quasi-estoppel, or judicial estoppel in the mind of the State Court is immaterial. The Plaintiff knowingly accepted the obligations of the Second Home Equity Line, thereby ratified her signature, and is now estopped from denying the validity of the Second Home Equity Line.

The North Carolina Courts have adopted remedial interpretations of ratification, estoppel, and quasi-estoppel when dealing with inconsistent positions such as those taken by the Debtor in this case. In Chance v. Henderson, 134 N.C. App. 657, 658-59, 518 S.E.2d 780, 781 (1999), a husband and wife entered into a separation agreement, but the wife subsequently filed suit to set aside the agreement. Ultimately, the parties reported to the state court that they had resolved all issues and the terms of the settlement agreement were read into the record and acknowledged by the husband on the record. Id. at 659, 518 S.E.2d at 781-82. Before the order could be entered, however, the husband withdrew his consent to the resolution, and counsel for the husband informed the court that his consent had been withdrawn. Id. at 659, 518 S.E.2d at 782. The state court nevertheless entered the order. Id. After entry of the order, the husband appealed, but the appeal was dismissed for failure to prosecute. Id. at 660, 518 S.E.2d at 782. Despite having objected to the entry of the order and thereafter appealing it, the husband continued with the

the allegations in the complaint and the matters of which the Court can take judicial notice establish ratification and/or quasi-estoppel as a matter of law.

underlying litigation, filing three motions to modify the order and a motion to hold his wife in contempt for failure to abide by the order. Id. Finally, the husband filed a motion to set aside the order as void for lack of consent. Id. The North Carolina Court of Appeals upheld the trial court's denial of the motion to set aside the order, finding that the husband was estopped from denying the validity of the order, having ratified it by his actions. Id. at 664-65, 518 S.E.2d at 784-85. In finding that the husband had ratified his obligations under the order, the court took "particular[] note [of] defendant's efforts to modify, correct and enforce stipulated terms of the order." Id. at 665, 518 S.E.2d at 785.

In refusing to allow the husband to escape the effect of the prior order, the court applied notions of ratification, estoppel, and quasi-estoppel. The court first stated the general principle that ratification may give rise to estoppel. Id. at 664, 518 S.E.2d at 784. Under principles of estoppel, the court noted that "'[a] party who, with knowledge of the facts, accepts the benefits of a transaction, may not thereafter attack the validity of the transaction to the detriment of other parties who relied thereon.'" Id. (quoting Yarborough v. Yarborough, 27 N.C. App. 100, 105-06, 218 S.E.2d 411, 415, cert. denied, 288 N.C. 734, 220 S.E.2d 353 (1975)). The court further noted that, under quasi-estoppel, "'one is not permitted to injure another by taking a position inconsistent with prior conduct, regardless of whether the person had actually relied upon that conduct.'" Id. at 665, 518 S.E.2d at 785 (quoting Mayer v. Mayer, 66 N.C. App. 522, 532, 311 S.E.2d 659, 666, disc. review denied, 311 N.C. 760, 321 S.E.2d 140 (1984)).

Applying these principles of estoppel, quasi-estoppel, and ratification, the court concluded:

> [W]e hold defendant may not now avoid the terms of the Order which he acknowledged, acquiesced in and attempted to modify and enforce over a

> two year period…. Moreover, defendant's actions also affected plaintiff's rights and obligations under the Order…. Defendant in essence ratified and affirmed the Order and is now estopped from seeking to avoid its effect.

Id. at 666, 518 S.E.2d 786.

As in Chance, the Debtor here sought to modify and enforce the First State Court Order against the Mr. Smith for over two years after it was entered. Pursuant to her motions, Mr. Smith was found in contempt and ordered to pay attorneys' fees in the amount of $520, and the Debtor was relieved of her obligation under the First State Court Order to indemnify Mr. Smith for any failure to make payments under the Farm Equity Line and the First Home Equity Line. (Third State Court Order at pp. 4-5). Moreover, the Debtor obtained and accepted sole ownership of the Farm and the Home under the terms of the order, and now seeks to recover the entirety of any proceeds from the sale of the Home to the extent that SunTrust's lien is avoided. The Debtor cannot engage in what has become a six year course of conduct under which she has obtained and sought to enforce the benefits of the order, and, at the same time, argue that she should not be bound by its obligations, to the detriment of Mr. Smith, who remains obligated to SunTrust under the Second Home Equity Line.

The United States Bankruptcy Court for the Eastern District of Missouri similarly has found that a debtor who agrees to pay an obligation under a property settlement has ratified the obligation even when her signature was forged to the original obligation. In Kuschel v. Kuschel (In re Kuschel), 365 B.R. 910 (Bankr. E.D. Mo. 2007), the debtor challenged her obligation under a student loan consolidation note, arguing that her signature on the loan had been forged by her ex-husband. After entry of the consolidation loan, the parties dissolved their marriage and entered into a property

settlement and separation agreement under which the debtor agreed to make the payments for the consolidation loan. Id. at 913. After entry of the separation agreement, the debtor further signed two forbearance agreements with the lender. Id. at 915. The debtor failed to pay the consolidation loan, filed a bankruptcy case under Chapter 7, and initiated an adversary proceeding, seeking to declare the consolidation loan a dischargeable debt. Id. at 912-13. The debtor argued that she was not liable on the debt because she did not sign the consolidation note and that her signature was forged. Id. at 915. The court nevertheless held that, by signing the separation agreement under which she agreed to pay the consolidation loan, and by signing the forbearance agreements, the debtor ratified the note. Id. at 915-16.

As in Kuschel, the Debtor in this case agreed to pay the Second Home Equity Line in at least one order entered by the State Court, and thereafter signed the Modification Agreement acknowledging the obligation, made payments under the loan and the Modification Agreement, and attempted to enforce the other terms against Mr. Smith for over five years. The Debtor therefore has ratified her previously unauthorized signature on the Second Home Equity Line, rendering the Second Home Equity Line enforceable. Thus, as previously discussed, the Debtor cannot plausibly be considered to be entitled to any of the relief sought in the Complaint, because each claim must fall upon the enforceability of the Second Home Equity Line.

**Debtor's Incentives to Ratify and Economic Duress**

Perhaps understanding that her actions are inconsistent with any other purpose other than ratifying the forgery, the Debtor intimates that she did not enter the First State

Court Order voluntarily and that she did not sign the Modification Agreement Voluntarily. Regarding the order, the Debtor argues:

> And what was Debtor's intent in signing [The First State Court Order]? Did she sign the Consent Decree for reasons other than ratifying a $75,000 loan, such as resolving a nasty divorce, fear of reprisal from her ex-husband, arm-twisting from her Attorney to 'get something done-you're running out of money'? Do we know her intent at the time of the execution of the Consent decree and whether it was freely exercised?

(Supplemental Brief at p. 4).

To the extent that the Debtor is attempting to argue that she ratified the Second Home Equity Line for reasons other than wanting to become responsible for the debt, the Debtor misunderstands the requirement that "the conduct [constituting ratification] must be consistent with an intent to affirm the unauthorized act and inconsistent with any other purpose." American Travel Corp., 57 N.C.App. at 442, 291 S.E.2d at 896. Purpose and intent are distinct from motivation and incentive. The Debtor's incentives, or motives, which led her to knowingly ratify the obligation, are immaterial here. Her actions clearly manifested the purpose, or intent, of affirming the obligation. The Court is not required to determine what inspired the Debtor to ratify the loan. No one would ratify a loan and incur an obligation to pay a debt without an incentive to do so. The fact that the Debtor's incentives in this case might have been to resolve a "nasty divorce" and to avoid "running out of money" does not vitiate her unambiguous ratification of the obligation.

With respect to the Modification Agreement, the Debtor alleges that the Modification Agreement was "gained by substantially unequal bargaining position under threat of foreclosure of Debtor's principal residence." (Complaint ¶ 42). To the extent that the Debtor argues that she signed the Modification Agreement under economic duress due to the "unequal bargaining position under threat of foreclosure" and is thereby

relieved of the effects of the Modification Agreement, the facts of this case do not state a claim for economic duress. As explained by the Fourth Circuit:

> Under North Carolina law, a person who enters a contract under duress can avoid his obligations under that contract…. Economic duress arises from the illegitimate use of economic power outside the bounds of a contract or the law….Thus, the mere threat by one party to breach a contract, though wrongful, does not establish economic duress…. Economic duress occurs when a party's wrongful action forces another to make a contractual promise, or else suffer irreparable injury…. In addition, the wronged party must have 'no immediate and adequate remedy in the courts' that would enable him to resist the other's demands.

Bob McClemore and Co., Inc. v. Branch Banking & Trust (In re Maco Homes, Inc.), Nos. 95-2938, 95-2939, 1996 WL 511494, at *4 (4th Cir. Sept. 10, 1996) (emphasis added). In Maco Homes, the Fourth Circuit affirmed the dismissal of the plaintiff's claim for economic duress with respect to waivers granted in a forbearance agreement because, in lieu of foreclosure, the plaintiff could have filed bankruptcy and challenged the lien and debt in that context. Id. Therefore, there was an adequate remedy in the courts. In this case, as in Maco Homes, the Debtor was free to file bankruptcy to forestall the foreclosure, as she ultimately did. Instead, she elected to enter the Modification Agreement, and the threat of foreclosure does not excuse her of the consequences of that choice.

## V. Conclusion

For the reasons set forth herein, the Court will: (1) enter an Order GRANTING SunTrust's Motion to Dismiss the Complaint, dismissing the Complaint with prejudice, and directing the Trustee to disburse any remaining proceeds from the sale of the Home to SunTrust; and (2) enter an Order DENYING Mr. Smith's Motion to Dismiss as MOOT.

[END OF DOCUMENT]